(89 South. 876)

No. 22970.

NEW ORLEANS TERMINAL CO. v. WEXLER.

(Oct. 31, 1921.)

*(Syllabus by the Court.)*

1. Vendor and purchaser ⟨⟩79—Sales; purchaser can refuse to accept and pay for lots where remainder of price would be insufficient to secure others vendor had agreed to furnish.

Plaintiff and defendant having entered into a contract whereby defendant agreed to acquire and deliver to plaintiff all the property included within four city squares, consisting, mainly, of improved lots of various values, and belonging to different owners, for the fixed price of $1,500,000, to be paid in installments from time to time, with the right accorded plaintiff always to reserve a sufficient proportion of such price to secure the delivery of or to enable it otherwise to acquire the undelivered lots, and with the proviso that, in the event that defendant should not be able to acquire particular lots at reasonable prices, plaintiff's right of expropriation should be exercised, but at defendant's expense, and, a time having arrived when, the major portion of the lots having been delivered and the major portion of the price paid, the estimated cost of acquiring the remaining lots exceeded the balance of such price in the hands of the plaintiff, *held*,

that plaintiff was within its rights in refusing to accept and pay for lots separately tendered at fixed prices, the payment of which would have left in its hands an insufficient proportion of the total price to acquire, in the event of defendant's failure to deliver them, the undelivered lots called for by the contract.

2. Vendor and purchaser ⟨⟩79—Sales; party agreeing to deliver lots held not to have fulfilled contract.

Conceding arguendo that in the case as presented the defendant might satisfy the contract by tendering the undelivered lots, in consideration of the payment of the balance due on the contract, he cannot satisfy the contract, or plaintiff's demand for the estimated cost of acquiring such lots, coupled with a tender of such balance, by tendering one lot at a price greatly exceeding its value, and making no tender as to a third lot, where the estimated cost of acquiring the three lots exceeds the balance of the agreed price as called for by contract, nor does it affect the question that the estimated value of the three lots may be less than the estimated cost at which they may be acquired, and less than such balance of price, since, if defendant is unable to acquire them and deliver them within the terms of the contract, it is he, and not the plaintiff, who is to meet that difficulty, in the absence of any request on his part that plaintiff exercise the right of expropriation and of any defense on the ground that such request was refused or could not have been complied with.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by the New Orleans Terminal Company against Solomon Wexler. From a judgment in favor of the plaintiff, the defendant appeals. Affirmed.

Gustave Lemle, Hunter C. Leake, and Milling, Godchaux, Saal & Milling, all of New Orleans, for appellant.

McCloskey & Benedict, of New Orleans, for appellee.

Statement of the Case.

MONROE, C. J. In the early part of 1905 plaintiff was negotiating with the city of New Orleans for the acquisition of the neutral ground on North Basin street between Canal and St. Louis, and for certain privi-

leges on North Basin street, with a view of erecting a depot, which movement suggested to defendant the idea that money might be made by acquiring options on the property constituting the four squares (or parallelograms) lying contiguous to North Basin street (river side) between the two streets above mentioned, and he promptly acted upon that idea by buying options on certain portions of that property, consisting, in the main, of improved lots held by different owners, and further acted on it by entering into the contract with plaintiff out of which this suit has arisen, whereby he agreed, in consideration of the payment to him in installments from time to time of $1,500,000, to sell and deliver to plaintiff in full ownership all of the property embraced within said squares, with the proviso that, in the event that he should be unable to acquire a particular lot for a price that he considered reasonable, it should be acquired by expropriation at his expense. The contract was entered into verbally between defendant and L. S. Berg, plaintiff's president, acting in its behalf, and its execution began on May 17, 1905, with the payment by plaintiff to defendant of $50,000, and was continued by payments varying from that amount to $250,-000 until, with a payment of $9,500, on April 24, 1908, the aggregate amount paid was $1,472,198.84, and the balance of the whole agreed price left on hand was $27,801.16, with three pieces of property undelivered, the cost of delivering which, it was estimated, would amount to $40,000, as follows: "Mendelson" property, $5,000; "Church," $25,000; "Danzic," $10,000. And matters remained in that condition until December, 1910, when defendant tendered the Mendelson property (for which it is said), he paid $6,000, and the tender was refused by plaintiff's then president, who required that the three undelivered pieces be delivered at the same time. The Church property was never acquired by defendant, but in 1915 he wrote to plaintiff that he had acquired an option on it at $25,000, and offered to turn it over at that price; his purpose being (as he testifies) to protect himself against a later demand by plaintiff in the event of a rise in the price. The Danzic property was never either acquired or tendered by defendant; the price demanded having always been more than he was willing to pay. He, however, made no demand upon plaintiff that it be expropriated, but he testifies that he mentioned the subject to one of plaintiff's local attorneys and the attorney from St. Louis of a railroad company, and that they expressed some doubt as to plaintiff's right to expropriate "for the reason that the property was not being used for railroad purposes."

There is a difference between the testimony of Mr. Berg and that of defendant as to the conditions upon which the installments were to become due and were in fact paid. Mr. Berg, who was examined under commission as a witness for defendant, who claims Paris, France, as his residence, and who appears long since to have severed his connection with plaintiff, testifies upon that subject as follows:

"The agreed price for the property was $1,-500,000. It was a matter of indifference to the terminal company what sum Mr. Wexler paid for the individual pieces of property, so that the entire property was turned over to the company for the stipulated contract price of $1,500,000. Payment was made to Mr. Wexler from time to time for the property deeded by him to the terminal company and the property deeded by the owners direct to the terminal company, based upon what, in my opinion, was a fair proportion of the agreed price of $1,500,000, *reserving always, as nearly as possible, sufficient of the $1,500,000 to acquire any particular pieces of property not deeded up to that time, and* in each instance the price stipulated in the deed was agreed to by me and payment made on that basis." (Italics by present writer.)

Defendant gives the following (with some other) testimony on the same point, to wit ·

"Under the agreement, Mr. Berg was to pay me for the property based on $1,500,000 as fast as I acquired it, and in every instance made up to the amount of property received that I paid for, consolidated into a deed, went over with him the remaining property to be purchased, some of which was already under agreement to purchase, so, when the amount to be paid for it was definitely known and other properties were carefully estimated between him and myself, and he paid me on the basis of the property deeded on the basis of the agreement—the purchase price of $1,500,000. The last deed which I rendered him called for $157,300, and the property embraced in the deed had been ·purchased at different times, between December, 1905, and March, 1906, and on account of which he had paid me some ninety-odd thousand dollars, * * * leaving a· balance of $64,675 which should have been paid."

According to the deeds copied in the transcript, defendant made the following conveyances for the recited prices, payment of which was acknowledged, to wit: July 1, 1905, nineteen pieces of property for $507,200; July 27, 1905, seven pieces of property for $200,000; and March 5, 1906, seven pieces of property for $157,300. It is alleged in the petition and categorically admitted in the answer that defendant received payments (other than those which were made directly to the owners) as follows: May 17, 1905, $50,000; June 6, 1905, $100,000; June 10, 1905, $200,000; June 13, 1905, $75,000; June 26, 1905, $200,000; June 29, 1905, $100,000; July 1, 1905, $95,000; July 27, 1905, $100,000; July 31, 1905, $100,000; March 5, 1906, $50,000—making a total of $1,070,275, from which it will be seen that the payments were made without reference in a single instance to the consideration recited in the acts of conveyance.

The answer also contains the admission that defendant, "undertook and agreed for and in consideration of the price and sum of $1,500,000, to transfer to the terminal company, in fee simple and full ownership, all the real estate, together with the buildings and improvements thereon, situated in the city of New Orleans and contained in the four squares bounded by the lower side of Canal street, the woods or swamp side of North Rampart street, the upper side of St. Louis street and the river side of Basin street," which admission was followed by the allegation "that it was part and parcel of said contract that the said terminal company would purchase from respondent for cash at a price to be agreed upon at the time of the transfer each piece of property as it was purchased by respondent from the owner," etc. In the course of his examination as a witness defendant was asked how much he paid for the property turned over to plaintiff for the agreed consideration of $1,085,000, and (after an objection that the question was irrelevant) he answered:

"I have a statement here, made up at that time, which I have no reason to believe is not correct; I found it among my papers, and it shows that deed No. 1, calling for $500,200 and the property. net, cost me $360,000, exclusive of all commissions and expenses, taxes and other charges; that deed No. 2, for $200,000, cost me $139,750, exclusive of the same charges; and deed No. 3, $157,300, against $122,000, exclusive of the same charges."

At another place in his testimony he says that his net profit on the deal was $160,000, but that he lost part of that by buying property in another square in the expectation that plaintiff might need it, and he finally estimates his clear profit at $100,000 which plaintiff's counsel think is entirely too modest an estimate.

In view, then, of the specific judicial admission that defendant was to deliver all the property in the four squares for a total price of $1,500,000, it seems clear that· Mr. Berg, who was his witness, and the only witness other than himself who could and did testify as to the contract between them, gives the more reasonable interpretation of the meaning and intention of the parties when he says that what sums Mr. Wexler

paid for particular pieces of the property was a matter of indifference to plaintiff so long as the entire property was turned over to it at the stipulated total price of $1,500,-000, and that the payments made were based upon what "in his opinion" was a fair proportion of that price, "reserving always as nearly as possible, sufficient of the $1,500,-000 to acquire any particular pieces of property not conveyed up to that time"; and it is equally clear that, acting for the company, he was entirely within its rights when on March 5, 1906, finding that, after the payment of $50,000, he had not enough of the $1,500,000 left wherewith, in case of nondelivery by defendant, to acquire the undelivered pieces of property called for by the contract, he declined to make any further payment until it should be justified by further delivery. It is true that he and defendant on that day signed a certain instrument, but, in view of the specific judicial admissions herein made, from which it appears that $1,472,198.84 of the $1,500.000 called for by contract have been paid, and hence that only $27,801.16 are left on hand, with undelivered property, the estimated cost of which exceeds that amount by over $10,000, the introduction of that instrument into the case serves no other purpose than to indicate or create a confusion of ideas. The instrument reads as follows:

"Whereas, Sol. Wexler has this day sold to the New Orleans Terminal Company seven pieces of property for the sum of $157,300 as per deed; * * * and whereas, there was due him on account of the purchase of said property the sum of $64,675 by the said New Orleans Terminal Company; and whereas, there still remain to be purchased six pieces of property in the squares bounded by Canal, Toulouse, Rampart, and Basin streets, which the said Sol. Wexler has agreed to deliver to the said * * * company for the sum of $107,000: Now, therefore, it is agreed that the sum of $14,675 shall be retained by the said * * * company to guarantee to them the delivery of the said remaining six pieces of property at the price of $107,000 above referred to; it being distinctly understood that the said amount of $14,675 is due to the said Sol. Wexler and shall be paid to him whenever the said property has been deeded to the New Orleans Terminal Company at the above price. But, should the said property cost more than the $107,000 any additional cost thereof is to be deducted from the fourteen thousand three (sic) hundred and seventy-five dollars, and the remainder thereof paid to the said Sol. Wexler.

"Thus done and signed in duplicate this 5th day of March, 1906.

"[Signed] Sol. Wexler.
"N. O. Terminal Co.,
"By L. S. Berg."

The six pieces of property referred to in the foregoing instrument are designated, and the cost at which it was estimated that they might respectively have been delivered to plaintiff is stated as follows: "School," $45,-000; "Express Company," $12,500; "Feucht," $9,500; "Mendelson," $5,000; "Church," $25,-000; "Danzic," $10,000. As a matter of fact, the school property cost $70,000, the Express Company property $13,220.87, and those pieces, together with the Feucht property, were delivered, though the school property not until after March 5, 1906, and as the cost additional to that estimated exceeded by more than $11,000 the $14,675 referred to in the instrument of that date, that item, by the terms of the instrument, was more than eliminated.

Defendant alleges in his answer that—

"On the 27th day of December, 1910, he acquired for the price and sum of $6,000 cash what is known as the Mendelson property, which he immediately tendered to petitioner at that price, which was a fair and reasonable price for said property; that petitioner, while making no objection to said price and practically admitting that it was a fair and reasonable price, * * * refused to accept and pay for said property because respondent did not at the same time tender all the remaining property in said squares."

When on the stand as a witness, Mr. Wexler seems to have forgotten what he had al-

leged in his answer, and, referring to the same property, testified as follows:

"The actual value of it was not more than $2,000, at most, and he [Mendelson] wanted $7,500, and, under the agreement to expropriate, I declined to pay that price. If I had acceded to the demand of every owner, this property would have cost me $2,500,000 instead of less than $1,500,000. I then loaned $3,000 on the Mendelson property, in order to hold my grip on it, and he finally agreed to sell it to me for $6,000, which was an exorbitant price, and I took it and tendered it to the terminal company."

And at the time that he made the tender the terminal company had in hand but $27,801.16 of the $1,500,000 which it had agreed to pay for all the property, and there were undelivered the Mendelson property, for which defendant demanded $6,000, the Church property, which he had not acquired, and which was held by the owner at $25,000, and the Danzic property, which was held by the owner at $10,000 making a total of $41,000 in property that defendant owed plaintiff against $27,801.16 that plaintiff held by way of security, which amount defendant proposed to reduce by the delivery at a valuation of $6,000 of a piece of property that he swears was worth, at most, $2,000, leaving $21,801.16 as security for the delivery of property which was held by the owners at $35,000.

In his answer defendant "denies that he ever agreed to pay $50 a month on account of a life usufruct with which a lot designated as the Jung property was incumbered, but his testimony on that subject reads as follows:

"Q. (By defendant's counsel). Mr. Wexler, referring to the Jung property, you have in the past been (?) paid some definite amount—you have agreed that the value for the use of that property, by a third person, was worth the sum of $50. How long is that agreement to continue? A. There was no definite time. Mr. Curran [plaintiff's then president] called on me once and said he thought that the terminal company was entitled to some compensation for thus being kept out of the use of that property. I said that that was fair; and he said, 'How much do you think is fair?' We agreed on $50. During that time all of the property along the road was occupied, and it had a rental value of $50 a month. And they sent me one charge memorandum of $750 covering 15 months. After that I received no further charge memorandum, and the question of the rental of that property was never brought up. No definite time was fixed in which $50 was to be paid, and it rocked along that way because we were on real good terms and never anticipated any trouble."

There was, of course, no question of rental as between plaintiff and defendant. Defendant had agreed to deliver the property in full ownership, and had been paid the price; and, having delivered it incumbered with a life usufruct, he was bound to make good his failure to comply with his contract, which he did in agreeing to compensate plaintiff for the loss of the use of the property by paying a monthly stipend which he considered fair, and which, by fair implication, was intended to cover the period of the usufruct. He seems to be mistaken in saying that he heard no more of the matter after the bill for $750 (if that is what he meant to say), since we find in the record a letter delivered to him by a later president than Mr. Curran in which, under date May 12, 1912, the writer says:

"Referring to our conversation of a few days ago, I inclose herewith a financial and property statement as the Rampart street property stands on our books, which indicates that you are to deliver to us three additional pieces of property, satisfy the estate of the Jung property, for which we are now paying $50 a month, which is being charged to your account, leaving a balance due you as of March 31st $24,151.16, which is due when the above property and lease is delivered. I trust that you will be able to close this matter out at an early date.

"Yours truly,

"[Signed]  A. D. Lightner, President."

Plaintiff summarizes its claim as follows:

Value of Church property, undelivered by
   said Wexler .............................. $25,000 00
Value of Danzic property, undelivered by
   said Wexler .............................. 7,000 00
Value of Mendelson property, undelivered
   by said. Wexler............................ 6,000 00

   Total ..................................... $38,000 00
   Balance of contract price................ 27,801 16

                                   $10,198 84
Compensation for outstanding usufruct on
   Jung property March 1, 1905, to Decem-
   ber 31, 1915, 9 years, 10 months, at $50
   per month, as per agreement.............. 5,900 00

   Total ..................................... $16,098 84
Add $50 per month, from December 31, 1915, for
each month during continuation of usufruct on
Jung property.

The prayer of the answer reads:

"Wherefore respondent prays that petitioner he decreed to take title to the Mendelson property; that he recover judgment against petitioner for the interest, taxes, and other disbursements made by him for the account of said Mendelson property since he acquired it, with legal interest on each of said disbursements from the respective dates that they were made; that respondent do have and recover judgment against petitioner for the further sum of $27,801.16, with legal interest on $14,675 from March 5, 1906, until paid, on $6,000 from December 27, 1910, until paid, and on $7,126.16 until paid; that said judgment be credited with the fair market value of the Church property and the fair market value of the Danzic property, and $50 per month from March 1, 1905, to January 31, 1916, and $25 per month thereafter until the termination of the usufruct on the Jung property; and that, in all other respects, the demands of the plaintiff be rejected."

The judge a quo gave judgment for plaintiff in the sum of $25,124.44, based upon the following computation, to wit:

Value of three properties, undelivered...... $38,000 00
Value due by defendant to Mr. Sol. Wexler
   to complete $1,500,000...................... 27,801 16

   Balance due plaintiff..................... $10,198 84
With 5% interest thereon from March 5,
   1906, to January 5, 1918, 142 months...... 6,035 00
Jung usufruct, to date of suit.............. 5,900 00
Jung usufruct, since suit to January 5, 1918 1,200 00
Interest on Jung usufruct 5% on each $50
   monthly, from March 5, 1906, to January
   5, 1918 ..................................... 1,801 00

                                     $25,135 44

The sum of the added figures should be $25,134.84 (instead of $25,135.44, as appears on the above statement), and the judgment should be for $25,134.84 (instead of $25,124.44), but plaintiff makes no complaint, and defendant is the gainer by those errors.

## Opinion.

[1] The intention of the parties to the contract here sued on, as we understand their testimony, was that all of the property contracted for should be delivered to plaintiff for the total price of $1,500,000, and that, while payments were to be made from time to time, the right was accorded plaintiff always to hold in reserve a sufficient proportion of that price to secure the delivery by defendant, or in default of such delivery to enable it to buy, such of the property as might otherwise remain undelivered, considered with reference, not to what might be regarded as its ordinary market value, but with reference to what was likely to be the price at which defendant would be able to buy and deliver it, or at which it might be expropriated if defendant so requested; so that, when at any time the probable cost of acquiring and delivering property called for by the contract, but undelivered, seemed likely to equal or exceed the balance in plaintiff's hands of the total agreed price, plaintiff was entirely within its rights in withholding further payments until its margin was made reasonably safe.

As a basis of the agreement of March 5, 1906, it was estimated that undelivered pieces of property therein referred to would cost defendant $107,000, including the school property, at $45,000, the express company property at $12,500, the Church property at $25,000, the Danzic property at $10,000, the Mendelson property at $5,000, and it was specifically agreed that, "should the said property cost more that $107,000 [thereby reducing plaintiff's margin], any additional cost thereof is to be deducted from the $14,-

375 [should be $14,675]" and the "remainder thereof paid to the said Wexler." As the matter turned out, the "additional cost" thus referred to amounted in the case of the school property to $25,000, in the case of the Mendelson property to $1,000, and in the case of the express company property to $970.87, or a total of $26,970.87, as against the $14,675.00, so that, as we have already stated, by the very terms of the agreement of March 5, 1906, the supposed debt of $14,-675 was more than canceled. Apart from that, this suit was brought in January, 1916, and it is admitted and is beyond question that nearly 10 years before it was brought plaintiff had paid defendant $1,472,198.84, and held a balance of the agreed price of $1,500,000, which can become due only when the property for which plaintiff agreed to pay said price shall have been delivered, and not before such delivery or an accounting in some other way.

The claim set up by defendant for the item of $14,675, with interest, is therefore chimerical and has no place in this case. And the same may be said with regard to the claim for interest, taxes, etc., based on defendant's purchase of, and plaintiff's refusal to accept, the Mendelson property; for plaintiff was under no obligation to accept that property and pay in cash the $6,000 demanded therefor, since by so doing the balance in its hands would have been reduced from $27,801.16 to $21,801.16 with the Church and the Danzic properties, the estimated cost of acquiring which was $35,000, still undelivered, and when in 1915 defendant wrote that he had acquired an option on the Church property, and would deliver it on payment of $25,000, the plaintiff accepting that offer, would have found itself short to the extent of $3,198.84 of the amount required to make the payment, and, if it supplied that amount, would have paid defendant that much more than it had agreed to pay him, and would still have fallen short of receiving the property which he had agreed to deliver to the extent of the Danzic property estimated in 1905 at $10,000, and which defendant testifies that he was never able to buy for less money, and hence did not buy.

[2] Having bought the Mendelson property, and, according to his testimony, without having called on plaintiff to expropriate having paid three times its value for it, defendant now tenders it to plaintiff for what he paid, with interest and costs, and his counsel say, in effect, that the value of the property has nothing to do with the case, which is true, but it is equally true that the price that he may have paid has nothing to do with the case. He agreed to deliver certain property for $1,500,000, whether it should cost him more than that amount or less. He succeeded in buying the greater portion of it for two or three hundreds of thousands of dollars less than the contract price that he was to receive. He says, in his testimony:

"I might have paid for the property $2,000,-000, and I might have lost $500,000 in the purchase; I could only then get from the terminal company, $1,500,000."

But, while he insists that defendant should take the Mendelson property at $6,000, and credit him with that amount, because he has paid it, he likewise insists, illogically, as it appears to us, that plaintiff should charge him with the Church and Danzic at only the actual values as fixed by the real estate dealers whom he has called as witnesses, though neither he nor they pretend to say that plaintiff could acquire those properties at the values so fixed. He admits that he was for 10 years trying in vain to buy the Church property, and that it was only in 1915 that he was able to get an option on it at $25,000, which he then tendered to plaintiff at a time when plaintiff had but $27,801.16 of the

$1,500,000 that it had agreed to give for all of the property, and the Mendelson and Danzic properties were undelivered. He admits that he has never been able to get an offer of the Danzic property for less than $10,000, and that he refused to buy it at that price, and intended to resort to expropriation. But he does not pretend that he at any time requested plaintiff to institute expropriation proceedings with reference to any of the property. If he was of opinion that those properties could be· acquired for less money, it appears to us that he should so have acquired them, and that his tender of the three properties, even at this late day, together with the amount due on account of the incumbrance on the Jung property, would have met the demands herein made, and have entitled him to the balance of price which would then become due under the contract.

Counsel appears to have conducted the case upon the theory that it is an action for an accounting, and, if that theory be correct; it appears to us, considering the time that has been allowed defendant, the letter of demand by plaintiff's president, of May 30, 1912, and the bringing of this suit, that no further putting in default was needed. It has been shown that defendant has· departed this life since the submission of the case, and on motion of plaintiff's counsel, to which opposing counsel h·ve consented, his executors have ·been made parties hereto. Finding no error in the judgment appealed from, it is accordingly affirmed.

OVERTON and LAND, JJ., take no part, not having been members of the court when the case was argued.

BAKER, J., takes no part for the same reason.